UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                                                      :
UNITED STATES OF AMERICA                                              :
                                                                      :
                                                                      :
            -v-                                                       :            20-cr-464 (LJL)
                                                                      :
MALIK DEJESUS,                                                        :            OPINION AND ORDER
                                                                      :
                        Defendant.                                    :
                                                                      :
--------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Malik DeJesus ("Defendant" or "DeJesus") moves, pursuant to Fed. R. Crim.

P. 12(b)(3) and 41(f), to suppress physical evidence against him obtained as a result of a

warrantless search and seizure conducted by his New York parole officer and the New York City

Police Department ("NYPD") on February 20, 2020.  Dkt. No. 14.  At the time of the search,

DeJesus was subject to supervision on parole from his state court conviction.  DeJesus claims

that evidence obtained as a result of the search and of a subsequent search pursuant to a search

warrant was the fruit of an unconstitutional search of his apartment.[1]

For the following reasons, the motion is denied.

## BACKGROUND

### A.      The Warrantless Search

The following facts are based on the testimony of New York Parole Officer Elvis

Guerrero ("Guerrero") of the New York State Department of Corrections and Community

---

[1] DeJesus also moves to suppress his post-arrest statements made to law enforcement.  The
Government represented it will not seek to admit those statements into evidence during its
case-in-chief.  Accordingly, DeJesus's motion is moot to the extent it seeks to suppress these
post-arrest statements.

Supervision at the hearing held on April 28, 2021, documentary evidence submitted by the defense in its motion on February 15, 2021, and court records of which the Court can take judicial notice.

DeJesus has prior felony convictions. On or about July 9, 2013, he pled guilty in Bronx County, Supreme Court to one count of criminal possession of a weapon in the second degree in violation of New York Penal Law § 265.03(3), a Class E felony, and was sentenced principally to a term of 42 months of imprisonment to be followed by three years' of supervised release. Dkt. No. 1 ¶ 3(a). On or about June 9, 2014, DeJesus pled guilty in Oswego County Court to one count of attempted burglary in the third degree in violation of New York Penal Law Section § 110/140.20, a Class E felony, and was sentenced principally to an indeterminate term of imprisonment of between 16 months and four years. *Id.* ¶ 3(b).

DeJesus was released from prison into parole supervision on February 6, 2017. *Id.* ¶ 3(c). At the time of his release, the term of supervision was scheduled to end on February 6, 2020. Four days prior to his release, DeJesus signed a Certificate of Release to Parole Supervision ("Certificate of Release") setting forth his conditions of release, among other things. Under the Certificate of Release, he voluntarily accepted parole supervision and indicated that he "fully underst[ood] that [his] person, residence and property are subject to search and inspection." Dkt. No. 15-3, Ex. C. He also understood that his parole supervision was defined by the conditions of release set forth in the Certificate of Release and that a violation of those conditions could result in the revocation of his release.

The Certificate sets forth eleven board mandates by which DeJesus was to abide and nine special conditions of release. The board mandates included the following:

4. I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property.
. . . .
8. I will not behave in such a manner as to violate the provisions of any law to which I am subject which provide [sic] for a penalty of imprisonment, nor will my behavior threaten the safety or well-being of myself or others.

9. I will not own, possess, or purchase any shotgun, rifle, or firearm of any type without the written permission of my Parole Officer.

*Id.*

DeJesus was originally supervised by Parole Officer Pozo. While under supervision by Pozo, DeJesus was arrested on January 27, 2018 after being found in possession of credit cards bearing other peoples' names and a fraudulently altered check. After he failed to make a required visit to the parole officer after his arrest and left his assigned residence, a parole absconder warrant was issued for his arrest on February 1, 2018, stopping the clock on the running of his term of parole. DeJesus was arrested and detained on April 23, 2018. DeJesus pled guilty to a violation of his conditions of release by failing to report to the parole officer and on June 6, 2018, his parole was revoked. As a result, his term of parole was extended for approximately four months to June 12, 2020. The Parole Revocation Decision Notice recites that after almost a year of reporting to the parole officer as directed, DeJesus absconded from supervision for a period of three months and seven days. It also states that DeJesus failed to report out of concern that his parole would be violated and he would be returned to prison, and it contains various mitigating factors, including DeJesus's positive reporting before he absconded, his efforts to find work, the absence of positive toxicology results, and the fact that he had a child on the way.[2]

---

[2] The Parole Revocation Decision Notice also reports that DeJesus was ultimately charged only with reckless driving and failure to stop at a stop sign. At the suppression hearing, Guerrero testified that he had not previously seen the Parole Revocation Decision Notice but he was aware

DeJesus was released to supervision on June 13, 2018 and Officer Guerrero took over responsibility as DeJesus's parole officer in September 2018. He had his initial in-person meeting with DeJesus that same month. At the time, Guerrero was a new probation officer.[3] Officer Guerrero had DeJesus sign a document entitled "Special Conditions of Release to Parole Supervision" that required DeJesus to report to his assigned parole officer at the parole office on a weekly basis and to maintain a curfew. It also contained DeJesus's acknowledgement that the special conditions would remain in effect until the termination of his legal period of supervision on June 12, 2020. *Id.* Guerrero testified that the two also discussed that DeJesus's term of supervision would expire in June 2020. Following the initial meeting with DeJesus, Guerrero met with him at least four times a month. Two of those meetings took place at DeJesus's home in the Bronx and the other two took place in the parole office.

On or about April 22, 2019, an investigator from the United States Postal Inspection Service ("USPIS") informed Guerrero that DeJesus was being investigated for participating in a scheme that involved stolen checks. DeJesus was arrested on separate charges in May 4, 2019. After the arrest, Guerrero continued to meet with DeJesus as part of his parole supervision. The record does not reflect any resolution of the USPIS investigation.

On February 20, 2020, Guerrero conducted a parole safety search or a "random parole safety search" at DeJesus's residence. Parole safety searches or random parole safety searches are conducted on a periodic basis by parole officers. The searches are considered random because they are not conducted on a set date or with respect to a set precinct. A supervisor

<hr />

when he began supervision that DeJesus had been involved in criminal activity that involved credit cards and checks.

[3] The record does not reflect when Guerrero first began his employment as a parole officer but at the time of the suppression hearing in April 2021, Guerrero had worked as a parole officer for three years.

exercises discretion to decide whether parole officers should conduct a random safety search on a particular day for a particular police precinct and elicits from each parole officer whether there are any suitable candidates from the particular precinct for such a search. The criteria for conducting a random safety search are that the parolees are exhibiting "pre-delinquent behaviors" and/or had incurred a prior arrest. Such pre-delinquent behaviors include, but are not limited to, curfew violations, positive drug test results, and prior arrests while on supervision. After each parole officer identifies a parolee from among their supervisees for a potential search, a senior parole officer then approves the candidate to be searched. Guerrero was informed that there would be a safety search of residences of certain parolees in the 41st precinct, where DeJesus resides, and Guerrero identified DeJesus as a candidate.

Guerrero arrived at DeJesus's building at approximately 7:00 a.m. on the morning of February 20, 2020, with at least ten other parole officers and NYPD law enforcement officers who would play the role of back-up. Guerrero rang the doorbell to the building, knocked on the apartment door, and was permitted to enter by DeJesus's mother. He went to DeJesus's bedroom where, after the mother woke DeJesus up, Guerrero placed DeJesus in handcuffs, a standard safety procedure when parole officers conduct a search. He and at least four other officers then commenced a search of the room. Guerrero observed a magnetic card reader to scan credit cards, in plain view, on top of the dresser in DeJesus's room. He also observed a brown paper bag in plain view, which was open and contained various checks in it with the names of different individuals. On top of the dresser, next to the brown paper bag, Guerrero observed identification cards and credit cards in plain view.

At one point during the search, one of Guerrero's colleagues informed him that there was a safe at the foot of DeJesus's bed. Guerrero lifted the safe and, upon hearing a rattling sound,

asked DeJesus what was inside but did not receive an answer.  Unable to open the safe, the parole officers called NYPD officers into the apartment, and the safe was moved from the bedroom to the kitchen.  At that point, Guerrero looked into the safe by shining a flashlight through holes on one side of it while looking through holes on other side and saw a gun inside the safe.  The NYPD officers did the same.  After the credit cards and other paraphernalia was discovered, along with the safe, the NYPD officers arrested DeJesus and seized the safe.  The NYPD officers had not participated in the search.

At the time Guerrero proposed DeJesus as a candidate for the parole safety search, he had responsibility for supervising between 50 and 80 parolees.  He had previously participated in safety searches, but none of those searches were directed to persons in the 41st precinct and he had never recommended a parolee for a safety search because he did not have any parolees in the other precincts who were exhibiting pre-delinquent behaviors.  Guerrero received on-the-job training on how to conduct searches of parolees and the permissible reasons for conducting a search of a parolee, including pre-delinquent behavior, but he did not receive formal training.  Guerrero was given no formal training at the parole academy on how to select parolees for searches.  There is no written protocol or manual that describes the criteria by which to pick a parolee for a search.  Guerrero did not understand the phrase "pre-delinquent behavior" to be defined anywhere and did not receive any instruction on how current information had to be for a parole officer to subject a parolee to a warrantless search.  Guerrero had never previously proposed DeJesus for a search, which he explained was due to the fact that DeJesus did not reside in the precincts where Guerrero had conducted searches.

DeJesus was one of two individuals whom Guerrero proposed for the 41st precinct search on February 20, 2020.  Guerrero did not record the reasons he selected DeJesus for a safety

search, but he testified that it was based on the information he received from the USPIS in April 2019, the arrest in May 2019, and his observations of DeJesus's social media posts.

Specifically, Guerrero knew of DeJesus's 2018 arrest from Officer Pozo and understood that it related to "credit cards or checks" that were not under DeJesus's name. He learned from the USPIS investigator in April 2019 that DeJesus was being investigated for his participation with others in a check washing scheme in Westchester County, which involved breaking into postal boxes and stealing checks, and was informed that there was video footage of DeJesus driving a BMW car leaving the scene where he and the others had broken into a postal box. He also learned from the USPIS investigator of DeJesus's social media presence on Instagram and his social media name, "Less Talk More Money." Guerrero also began monitoring DeJesus's social media account for several months and observed images of DeJesus driving a BMW that had not been reported to parole, DeJesus being outdoors during curfew hours, and DeJesus having jewelry and flashing money, which appeared to be inconsistent with DeJesus's reports to Guerrero of his financial income. When DeJesus was arrested in May 2019, Guerrero learned from the arresting officer that DeJesus had been found in possession of credit cards issued to other people along with marijuana. After the arrest, Guerrero continued to meet with DeJesus on a weekly basis. On November 5, 2019, DeJesus informed Guerrero that he was no longer working at the juice store where he had claimed to be working. Thereafter, and until the search on February 20, 2020, DeJesus did not have a job. During those meetings after November 5, 2019, Guerrero observed that DeJesus was very well dressed in designer jeans, belts, and sneakers as well as jewelry. He recalled that DeJesus had Balenciaga and Yeezy sneakers, including some limited editions.

There is some reason to question how seriously Guerrero took each of those events at the time.  DeJesus reported the May 2019 arrest to Guerrero within a day or two.  Guerrero also received a certificate from DeJesus indicating that the matter was not prosecuted due to insufficient evidence.  Guerrero's notes of his conversation with the arresting officer reflect that the officer told Guerrero that DeJesus "had a bag of marijuana on his person and several credit cards were in his possession" but that "due to [the officer] confusing the credit cards from [DeJesus] and the driver [of the car DeJesus was in when he was arrested], there was no way [DeJesus] could be investigated and [DeJesus] was not processed and let go. . . . [DeJesus] would not have been processed for the marijuana."  Following the arrest, Guerrero asked DeJesus to enroll in a drug program, which he did, and DeJesus tested negative for controlled substances throughout the program.  Guerrero did not himself view the video to which the USPIS investigator referred and never followed up with the investigator.  He also did not ask DeJesus about the Instagram images; at the time Guerrero viewed the Instagram images, DeJesus reported he was employed, albeit the employment was at a juice store and when Guerrero visited DeJesus's employment location, the employer did not recognize DeJesus.  Guerrero did not record any suspicious behavior in his notes.  He recorded that DeJesus reported he was employed, DeJesus appeared as scheduled for his office visits, and there is nothing in Guerrero's notes that reflect any concern regarding DeJesus's compliance with supervision.

### B.    The Instant Litigation

After the safe was moved from DeJesus's bedroom to the kitchen, NYPD officers remained in the apartment while a search warrant was obtained for a search of DeJesus's apartment and the safe.  At 11:29 a.m., the Honorable Frances Y. Wang, Justice of the Criminal Court of the State of New York, Bronx County, signed a search warrant for the premises and the safe to recover a "chrome revolver, as well as any additional firearms ammunition, and firearms

accessories." The search warrant was executed at 12:45 p.m., and the NYPD recovered a firearm, ammunition, United States currency, credit cards and identifications from the safe.

DeJesus was arrested on August 6, 2020 on charges of violations of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2. The complaint supporting the arrest warrant relied on the evidence of the firearm discovered inside the safe. Dkt. No. 1.

On September 3, 2020, a grand jury sitting in this District returned an indictment charging Malik-DeJesus in one count with being a felon in possession of a firearm, pursuant to 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2.

## DISCUSSION

DeJesus argues that the firearm was the fruit of an illegal search of his apartment and that it should not be received into evidence. He concedes that as a parolee, he can be lawfully subject to a warrantless search so long as "the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." *United States v. Newton*, 369 F.3d 659, 666-67 (2d Cir. 2004) (quoting *People v. Huntley*, 371 N.E.2d 794, 797 (N.Y. 1977)). He argues, however, that the *Huntley* test should be applied only "where the facts show reasonable suspicion," and that "[a] parole search that is so divorced from reasonable suspicion as to be arbitrary and capricious might not be considered rationally and substantially related to the parole officer's duty." Dkt. No. 16 at 9 (citing *United States v. Quinones*, 457 F. App'x 68, 70 (2d Cir. 2010)). He contends that the search of his apartment was "arbitrary and harassing" and that it was not rationally or reasonably related to the performance of the parole officers' duty. *Id.* at 9-10. According to DeJesus, a parole search should not go beyond what is necessary to "monitor conditions of release." *Id.* at 11; *see id.* at 12. The Government responds that reasonable suspicion is not required for a search of a parolee by its parole officer, but even if it had been, Guerrero had reasonable suspicion to search DeJesus's apartment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. "Based on this constitutional text, the Court has repeatedly held that 'searches conducted outside the judicial process, without prior approval by a [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles, Cal. v. Patel*, 576 U.S. 409, 419 (2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). The Supreme Court has also stated, however, that "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate Governmental interests.'" *United States v. Knights*, 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)); *see also Samson v. California*, 547 U.S. 843, 848-49 (2006).

One of the "specifically and well-delineated exceptions" pertains to persons who have been paroled from a sentence of imprisonment and who, as a condition of such parole, have been required to submit their person or property to search without a search warrant. Parolees, like probationers, have significant diminished expectation of privacy. *See Samson*, 547 U.S. at 852 ("[P]arolees . . . have severely diminished expectations of privacy by virtue of their status alone."); *United States v. Lambus*, 897 F.3d 368, 402 (2d Cir. 2018) ("Probationers, parolees, and persons subject to supervised release have 'significantly diminished' expectations of privacy."); *United States v. Grimes*, 225 F.3d 254, 258 (2d Cir. 2000) ("[P]arole justifies some departure from traditional Fourth Amendment standards."). The Supreme Court has "repeatedly acknowledged" that the State has an "'overwhelming interest' in supervising parolees," which

the Supreme Court has ascribed to the risk that "parolees . . . are more likely to commit future criminal offenses" as well as to the interests in reducing recidivism and promoting reintegration and positive citizenship. *Samson*, 547 U.S. at 853 (quoting *Pa. Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 365 (1998)). Thus, the Supreme Court has held that the State's interests "warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.* Searches of by parole officers of parolees, just like searches of probationers, fall within the "special needs" category of the Fourth Amendment and generally are excepted from the warrant requirement.

"[T]he law requires that . . . intrusions," like the search of the home here, "occur pursuant to a rule or regulation 'that itself satisfies the Fourth Amendment's reasonableness requirement.'" *Newton*, 369 F.3d at 665 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)). In this Circuit, that rule is supplied by the New York Court of Appeals decision in *Huntley*, which held that a New York parole officer can conduct a warrantless search if such search is "rationally and reasonably related to the performance of the parole officer's duty." *Newton*, 369 F.3d at 666-67 (quoting *Huntley*, 371 N.E.2d at 797). One of those duties is "to investigate whether a parolee is violating the conditions of his parole, . . . one of which, of course, is that the parolee commit no further crimes." *Newton*, 369 F.3d at 666 (quoting *United States v. Reyes*, 283 F.3d 446, 459 (2d Cir. 2002)); *see also Lambus*, 897 F.3d at 404 ("One aspect of 'the parole officer's duty' thus includes 'an obligation to detect and to prevent parole violations for the protection of the public from the commission of further crimes.'") (quoting *Huntley*, 371 N.E.2d at 797). "[A] parolee's release conditions forbid him to commit further crimes, and one of a parole officer's responsibilities is to detect whether the parolee is violating that condition." *Lambus*, 897 F.3d at 407. The analysis does not change if the probation officer

involves law enforcement in the search or if part of the objective of the search is to gather evidence for a federal prosecution. "[C]ollaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives." *Id.* at 405 (citing *Reyes*, 283 F.3d at 463).

The parties do not dispute that Guerrero was carrying out his duties as a parole officer in proposing DeJesus for a safety search and subjecting him to such a search. Guerrero had received information within the past year that suggested that DeJesus had been involved in criminal activity, and the detection of whether he was still involved in such activity, with months remaining on DeJesus's term of supervision, fell squarely within Guerrero's sphere of responsibility. Guerrero had not previously questioned DeJesus about his Instagram posts or his clothing and had not previously proposed DeJesus for a search, but the Court finds that the reasons proffered by Guerrero for the search in February 2020 were genuine and not pretextual. There is room for discretion in a parole officer's supervision of a parolee, which is not subject to "second-guessing by the court." *Lambus*, 897 F.3d at 408. Viewing each of the items in isolation, Guerrero was entitled to conclude that any of these items on its own was "minor" and did not require inquiry, much less a report to law enforcement. *See id.* (parole officer's "decisions not to violate [the parolee] for minor infractions . . . were surely matters for the State parole officials' exercise of their discretion"). And that Guerrero did not follow up on each of these items alone does not deprive him of the right to take advantage of the opportunity to conduct a safety search when the opportunity arose. *See id.* Nor does the fact that DeJesus was not previously a subject of a safety search make the February 2020 safety search somehow

suspect.  The testimony was uncontradicted that Guerrero did not have the opportunity to propose DeJesus for a random search earlier.  The earlier safety searches were of different precincts.  Finally, the fact that the NYPD served as back-up and that all participating in the search were aware that "a new prosecution might ensue is not a sign that the parole officer was not pursuing his normal duties."  *Id.* at 404.

The more challenging question relates to the objective component of the Fourth Amendment inquiry.  Prior to the Supreme Court's decision in *Samson*, the Second Circuit held that the *Huntley* test "is coextensive with the requirements of the Fourth Amendment."  *Grimes*, 225 F.3d at 259 n.4; *see United States v. Barner*, 666 F.3d 79, 84-85 (2d Cir. 2012).  *Huntley* states that the determination of whether a warrantless parole search is unreasonable turns on "whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty."  *Huntley*, 371 N.E.2d at 797.  But in *Samson*, the Supreme Court held that the Fourth Amendment was not violated by a police officer's suspicionless search of a parolee conducted pursuant to a California law under which every parolee "shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause."  *Samson*, 547 U.S. at 846 (quoting Cal. Penal Code Ann. § 3067(a)).  The Supreme Court concluded that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee," *id.* at 857, and that California law only prohibited searches that were "arbitrary, capricious, or harassing," *id.* at 856.

"The law is unclear whether the *Huntley* standard has been superseded by *Samson*," and "it is an open question whether Samson may justify a parole officer's suspicionless search of a New York parolee's home."  *Black v. Petitinato*, 761 F. App'x 18, 21 (2d Cir. 2019).  Because

"[c]ourts disagree as to whether or not the relevant parole regulation in New York is similar to the California statute at issue in *Samson* . . . there is no consensus on whether or not *Samson* applies to cases involving New York parolees."  *United States v. White*, 622 F. Supp. 2d 34, 41 (S.D.N.Y. 2008) (citing 9 N.Y.C.R.R. § 8003.2(d) ("A releasee will permit his parole officer to visit him at his residence and/or place of employment and will permit the search and inspection of his person, residence and property")).  Some courts have suggested that the regulation is similar, while several others have "noted in dicta that New York does not have a statute similar to the California statute at issue in *Samson*, and [have] declined to decide whether the parole regulation and waiver signed by parolees in New York are sufficiently similar to the California statute for *Samson* to apply, instead finding the searches lawful on other grounds."  *Id.* (collecting cases).

The Government argues with some force that the quantum of information needed for a parole officer in New York to conduct a search is not different from that required in *Samson*.  Under this argument, a parole officer's reasons need only survive the kind of review that a court would conduct of any agency decision, i.e., to ensure it is not arbitrary and capricious.  The Supreme Court in *Samson* specifically eschewed a requirement that a parole officer have reasonable suspicion necessary to conduct a warrantless search of a probationer in order to satisfy the Fourth Amendment.  It stated that "[i]mposing a reasonable suspicion requirement, as urged by petitioner, would give parolees greater opportunity to anticipate searches and conceal criminality," relying on the conclusion by "the California Legislature . . . that, given the number of inmates the State paroles and its high recidivism rate, a requirement that searches be based on individualized suspicion would undermine the State's ability to effectively supervise parolees and protect the public from criminal acts by reoffenders."  *Samson*, 547 U.S. at 854.  The

Supreme Court took comfort in, and seemed to rely on, the fact that its holding would not lead to "unbridled discretion to conduct searches" because a California court would review a decision to search to make sure it was not arbitrary and capricious. *Id.* at 856. A search may be deemed arbitrary, capricious, or harassing if, for example, it was conducted by a parole officer for personal reasons, such as to retaliate against a parolee for a perceived slight. *See* Dkt. No. 18 at 11. Such a search would also be considered not "rationally and reasonably related" to the parole officer's duties. *See id.*

DeJesus argues with equal force that although "*Samson* establish[es] the governing standards in this case," Dkt. No. 16 at 7, the constitutional test requires something more than that the parole officer's decision is not "arbitrary, capricious, or harassing" because "New York has no parole regulation permitting a warrantless search of a parolee absent reasonable suspicion," *id.* at 8. He notes that the Second Circuit has never interpreted *Huntley* so expansively to mean that *any* home parole search is "rationally and reasonably related to the parole officer's duty to monitor the parolee." *Id.* at 9. Instead, DeJesus argues, the Second Circuit has applied *Huntley* to cases where the facts demonstrated reasonable suspicion, suggesting that a "parole search that is so divorced from reasonable suspicion as to be arbitrary and capricious might not be considered rationally and substantially related to the performance of the parole officer's duty." *Id.* Thus, he contends, *Huntley*'s "reasonable relationship" test likely requires a finding of reasonable suspicion. *Cf. Newton*, 369 F.3d at 666 (referring to "*Huntley*'s articulation of a reasonable relationship rule for warrantless parole searches").

Indeed, Second Circuit decisions that have upheld warrantless searches of parolees in New York, both pre and post-*Samson*, have involved a tighter connection between the time of the information conveyed to the parole officer and the decision to search than the connection

here.  *See Barner*, 666 F.3d at 81 (search conducted two days after parole officer received phone call from a complainant that parolee had fired a weapon at him); *Newton*, 369 F.3d at 667 ("The parole officers entered Ms. Wright's apartment in response to her report that Newton possessed a gun at this residence and had recently threatened Ms. Wright and her husband."); *Huntley*, 371 N.E.2d at 796 (search conducted within days of parolee's failure to report); *cf. Reyes*, 283 F.3d at 451 (search conducted in immediate response to report of information that defendant was engaged in distribution of marijuana).[4]  The scope of the parolee's consent to search under the New York parole system "appears narrower than—and factually distinct from—the scope of the parole agreement in *Samson*."  *Watts*, 301 F. App'x at 42 n.2.  In addition to its narrower parole regulation that does not authorize "anytime, anywhere" searches such as in California, New York's law governing the reasonableness of parole searches is stated in the conjunctive.  The connection between the search and the officer's duties must be both rational *and* reasonably or substantially related.  As the Court of Appeals stressed in *Huntley*, it "would not be enough necessarily that there was some rational connection [between the search and the officer's duties]; the particular conduct must have also been substantially related to the performance of duty in the particular circumstances."  *Huntley*, 371 N.E.2d at 797.  The Second Circuit has used language in prior cases to the effect that the warrantless search "was performed in direct response to information that [the parole officer] obtained."  *Barner*, 666 F.3d at 85; *see also Newton*, 369 F.3d at 666.

---

[4] However, in an unpublished decision, the Second Circuit upheld Judge Buchwald's decision that a warrantless parole search conducted in October 2004 based on defendant's arrest four months earlier, in June 2004, did not violate the Fourth Amendment.  *See United States v. Watts*, 301 F. App'x 39, 42 (2d Cir. 2008).

And although the Government relies on a purported distinction between searches of probationers, which under New York statutory law may be conducted only based upon "reasonable cause to believe that the defendant has violated a condition of the sentence," N.Y. Crim. P. L. § 410.50, and the standard set forth in *Huntley* that appears to be something other than reasonable suspicion, that analogy seems to cut against the Government.  In *People v. Jackson*, the New York Court of Appeals held that the reasonable cause standard applicable to probationers "is essentially the same standard [*Huntley*] held should be used to determine the validity of a search of a person on parole by his parole officer."  385 N.E.2d 621, 623-24 (N.Y. 1978).  It stated that "[t]he substantive test [in the statute], namely, 'reasonable cause to believe that the defendant has violation a condition of the sentence,' apparently codifies case law which had generally held that the 'test of what is reasonable as a prerequisite for a search of the person or property of a probationer or parolee is whether the search is consistent with the duty to supervise adherence to the conditions of probation or parole and the duty to influence the offender to refrain from unlawful conduct.'"  *Id.* at 623.  Thus, the absence of "reasonable cause" language in the equivalent statute for parolees does not by itself confirm that reasonable suspicion is not required.

That said, the Second Circuit has declined to decide whether "*Samson* may justify a parole officer's suspicionless search of a New York parolee's home."  *Black*, 761 F. App'x at 21.  The Court similarly need not attempt to resolve that dispute.  Although the question is close, the facts here establish that Guerrero had at least reasonable suspicion that DeJesus had violated the terms of his release and was at risk for future violations sufficient to justify the search, and thus the search met the minimum constitutional requirements under both *Huntley* and *Samson*.

An officer has "a reasonable suspicion when he is in possession of 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [] intrusion.'" *United States v. Ojudun*, 915 F.3d 875, 882 (2d Cir. 2019) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). This "standard takes into account 'the totality of the circumstances—the whole picture.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *see United States v Colon*, 250 F.3d 130, 134 (2d Cir. 2001) (discussing reasonable suspicion standard). Moreover, even accepting *arguendo* DeJesus's argument that a search must be in direct response to the information giving rise to reasonable suspicion, that does not mean it must be in immediate response. Law enforcement has some discretion as to when it conducts police activities. It is not always wise for the case, or the best use of the agency's resources, to act immediately on evidence of criminal behavior. *See Lambus*, 897 F.3d at 408 (noting that officers need not arrest a defendant the moment they receive confirmation of criminal wrongdoing); *see also Hoffa v. United States*, 385 U.S. 293, 310 (1966) ("Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause."); *United States v. De Biasi*, 712 F.2d 785, 795 (2d Cir. 1983) ("[N]o constitutional duty to call a halt to the investigation and arrest [the defendant]."). Even in the context of a probable cause determination, where the facts "'establish[] a pattern of continuing criminal activity,' such that 'there is reason to believe that the cited activity was probably not a one-time occurrence,' the passage of time between the last alleged event and [a search] is less significant." *United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015) (quoting *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993)).

The facts available to Guerrero gave him such reasonable suspicion here. The search occurred against a backdrop of DeJesus's release on parole from a property offense, burglary. It also took place against a backdrop of Guerrero having receiving information that, shortly after DeJesus was released, DeJesus was arrested again in 2018 for a crime related to "credit cards or checks" that were not under DeJesus's name. Although the information Guerrero received was limited and did not involve a conviction, "in determining probable cause, a judicial officer may take into account a prior similar arrest." *United States v. Jakobetz*, 955 F.2d 786, 803 (2d Cir. 1994). Guerrero had reason to believe based on an articulable fact that the 2018 event was not a one-time occurrence. In April 2019, Guerrero was informed that DeJesus was being investigated for his participation with others in a check washing scheme in Westchester County. He was able to corroborate some of the information he received, i.e., that there was video footage of DeJesus driving a BMW car leaving the scene of the crime, by accessing DeJesus's social media account and viewing a video of DeJesus driving a BMW.

The suspicion that DeJesus was involved in continuing criminal activity was further supported by the information Guerrero received of DeJesus's arrest in May 2019. Although Guerrero testified on cross-examination that the arresting officer admitted that she co-mingled the credit cards from DeJesus and the other person in the car and there was not sufficient evidence to support a charge that DeJesus had someone else's credit cards, the Court accepts the Government's argument that Guerrero was told by the arresting officer that DeJesus was in possession of credit cards in names other than his own. That was Guerrero's testimony on direct examination. It was not contradicted on cross-examination. The defense pointed to Guerrero's notes of his conversation with the arresting officer, to which Guerrero testified on cross-examination. The notes reflect that Guerrero was told both that DeJesus possessed

marijuana and that he possessed "several credit cards," before noting that DeJesus could not be investigated because the officer had confused the credit cards from DeJesus and from the driver and therefore had to be released because he could not be processed for marijuana possession alone. As the Government argued, the inference from Guerrero's notes is that the credit cards were suspicious but that DeJesus could not be prosecuted for them because the officer commingled them. But the fact that an action is not ultimately prosecutable does not mean it cannot be suspicious. In short, the notes and testimony on cross-examination do not contradict but rather support Guerrero's recollection of his conversation with the arresting officer.

In addition, reasonable suspicion is supported by specific facts suggesting that DeJesus had unexplained wealth. *See United States v. All Right, Title & Int. in Real Prop. & Apurtenances Thereto Known as 785 St. Nicholas Ave. & 789 St. Nicholas Ave*, 983 F.2d 396, 405 (2d Cir. 1983) (evidence of unexplained wealth can support probable cause); *United States v. Diaz*, 675 F. Supp. 1382, 1386 (E.D.N.Y. 1987) (same); *see also United States v. Reyes*, 821 F.2d 168, 170 (2d Cir. 1987) (evidence of expensive round-trip flights were suspect when defendants had limited income); *United States v. Napoli*, 173 F.3d 847, 1999 WL 265024, at *3 (2d Cir. 1999) (summary order) ("It is well settled in this Circuit that unexplained wealth is relevant to create an inference of illicit gain."); *Quinones*, 457 F. App'x at 70 (warrantless search of parolee justified by discovery of $450 in cash on parolee's person in addition to his misrepresentation to parole officer). In the months after his April 2019 conversation with the USPIS investigator, Guerrero observed DeJesus on social media driving a BMW and wearing "a lot of jewelry and flashing a lot of money." Although that information was perhaps susceptible of innocent explanation, Guerrero was entitled to consider that evidence of DeJesus's expensive lifestyle could not be explained by his job and was in fact consistent with criminal activity. *See*

*United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) ("Even conduct that is 'as consistent with innocence as with guilt may for the basis for [reasonable suspicion] when there is some indication of possible illicit activity.'") (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)); *United States v. Monroe*, 2009 WL 3614521, at *6 (E.D.N.Y. Nov. 2, 2009) (*Terry* stop was based on reasonable suspicion when "several factors, alone as consistent with innocence as with guilt . . . merged together and with conduct tending to suggest an imminent threat of illegality"); *see also United States v. $32,507.00 in U.S. Currency*, 2014 WL 4626005, at *3 (S.D.N.Y. Sept. 16, 2014) (a defendant's "inability to explain where the currency came from actually raises some inference of illegal activity"); *United States v. $7,300 in U.S. Currency*, 2003 WL 21496858, at *3 (S.D.N.Y. June 27, 2003) (Lynch, J.) (only after government establishes probable cause does "the burden shift[] to the claimant to demonstrate . . . that the money represents legitimate income rather than the proceeds of illegal activity") (internal quotation marks and citation omitted).

Finally, that suspicion would only have been heightened by evidence that even after DeJesus claims he had stopped working in November 2019, he arrived at his meetings in the parole office wearing designed jeans, belts, and sneakers, all of which, based on the parole officer's knowledge and experience, were inconsistent with DeJesus's financial income.

When viewing these facts in their totality, and not in isolation, Guerrero had reasonable suspicion to believe that DeJesus was violating the terms of his parole. If he had such suspicion, it follows that the search was rationally and reasonably related to Guerrero's supervision of DeJesus. Accordingly, the search was constitutional under both *Huntley* and *Samson*.

Moreover, once Guerrero and the parole officers were able to view the safe (and the other material) in plain view, they were fully entitled to seize it. *See United States v. Massey*, 461 F.3d

177, 178-79 (2d Cir. 2006) (once parole officers observe evidence in plain view they are "fully entitled to seize" it); *Reyes*, 283 F.3d at 468 ("Contraband that falls within the plain view of a probation officer who is justified [in] being in the place where the contraband is seen may properly be seized by the probation officer, if it is immediately apparent that the item is contraband with respect to the supervisee.").

In light of the Court's finding that there was reasonable suspicion, it need not consider the Government's additional argument that suppression is not an appropriate remedy under *Davis v. United States*, 564 U.S. 229, 238 (2011).

**CONCLUSION**

The motion to suppress is DENIED. Dkt. No. 14.

SO ORDERED.

Dated: May 11, 2021
     New York, New York
                                       LEWIS J. LIMAN
                            United States District Judge